UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| ROOSEVELT COUNTY WATER COOP, INC.<br><br>    Plaintiff,<br><br>v.<br><br>3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.); E. I. DUPONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; DUPONT DE NEMOURS, INC.; CORTEVA, INC.; CHEMGUARD, INC.; TYCO FIRE PRODUCTS LP; KIDDE-FENWAL, INC.; KIDDE PLC, INC.; CHUBB FIRE, LTD.; UTC FIRE & SECURITY AMERICAS CORPORATION, INC.; CARRIER GLOBAL CORPORATION; RAYTHEON TECHNOLOGIES CORPORATION (f/k/a United Technologies Corporation); NATIONAL FOAM, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; ARKEMA, INC.; BASF CORPORATION; CHEMDESIGN PRODUCTS, INC.; CLARIANT CORPORATION; CHEMICALS INCORPORATED; NATION FORD CHEMICAL COMPANY; AGC CHEMICALS AMERICAS INC.; AGC INC. f/k/a ASAHI GLASS CO., LTD; DEEPWATER CHEMICALS, INC.; DYNAX CORPORATION; ARCHROMA MANAGEMENT, LLC; ARCHROMA U.S., INC.; AND JOHN DOE DEFENDANTS 1-49,<br><br>    Defendants. | Case No. 1:23-cv-376<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff, Roosevelt County Water Coop, Inc. ("Plaintiff"), by and through its undersigned counsel, brings this action against Defendants, 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), E. I. DuPont De Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours, Inc., Corteva, Inc., Chemguard, Inc., Tyco Fire Products LP (Individually and as successor-in-interest to The Ansul Company), Kidde-

Fenwal, Inc., KiddePLC, Inc., Chubb Fire, Ltd., UTC Fire & Security Americas Corporation, Inc., Carrier Global Corporation, Raytheon Technologies Corporation (f/k/a United Technologies Corporation), National Foam, Inc., Buckeye Fire Equipment Company, Arkema, Inc., BASF Corporation, ChemDesign Products, Inc., Clariant Corporation, Chemicals Incorporated, Nation Ford Chemical Company, AGC Chemicals Americas, Inc., AGC, Inc. (f/k/a Asahi Glass Co., Ltd.), Deepwater Chemicals, Inc., Dynax Corporation, Archroma Management, LLC, Archroma U.S., Inc., and John Doe Defendants 1-49 (collectively, "Defendants"), and alleges as follows:

## SUMMARY OF THE CASE

1.       Plaintiff brings this action against Defendants to recover any and all past, present and future compensatory and/or consequential damages for the investigation, remediation, removal, disposal, treatment, and monitoring of the ongoing contamination of its surface water, groundwater, soil, sediment, lands, infrastructures, facilities, and properties caused and/or created by Defendants' products, diminished property value, punitive damages, attorneys' fees and costs, as well as any and all other damages available as a result of the actions and/or inactions of Defendants.

2.       Plaintiff is a public utility in Portales, New Mexico, which provides drinking water services to residents of Roosevelt County who live outside the city of Portales, New Mexico.

3.       Plaintiff is the owner of various lands, properties, facilities, infrastructures, wells, and resources located throughout Roosevelt County, New Mexico (collectively, "Plaintiff's Property").

4.       Per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), have been detected in the groundwater at Plaintiff's Property.

5.       PFOA and PFOS are man-made compounds that are toxic and persistent in the environment, do not biodegrade, move readily through soil and groundwater, and pose a significant risk to human health and safety.

6.       At various times from the 1960s through today, Defendants designed,

manufactured, formulated, marketed, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of PFOA, PFOS, the chemical precursors of PFOA and/or PFOS, and/or aqueous filmforming foam ("AFFF") containing PFOA, PFOS and/or their chemical precursors (collectively, "Fluorosurfactant Products").

7.      AFFF is a firefighting agent used to control and extinguish Class B fuel fires and is used at sites such as military bases, airports, petroleum refineries, and fire training centers.

8.      For decades, Cannon Air Force Base has been actively used for firefighting drills and training which included the use, discharge, and/or release of AFFF at, near, and/or in the vicinity of Plaintiff's Property.

9.      Defendants designed, manufactured, formulated, marketed, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products with the knowledge that these toxic compounds would be released into the environment during fire protection, training, and response activities, even when used as directed and intended by the Defendants.

10.     Upon information and belief, at all times pertinent herein, Defendants' Fluorosurfactant Products have been released, used, stored, released, and/or disposed of at, near, and/or in the vicinity of Plaintiff's Property for fire protection, training and response activities. During these activities, Defendants' Fluorosurfactant Products were stored, used, cleaned up, and/or disposed of as directed and intended by the Defendants, which allowed PFOS, PFOA, and/or their chemical precursors to enter the environment, and migrate through the soil, sediment, surface water, and groundwater, thereby contaminating Plaintiff's Property.

11.     As a result of the use of Defendants' Fluorosurfactant Products for their intended purpose, PFOS, PFOA, and/or their chemical precursors have been detected in the soil, sediment, surface water, and groundwater of Plaintiff's Property at substantial levels.

12.     Plaintiff's Property has been, and continues to be, contaminated by Defendants' Fluorosurfactant Products.

13.     At all times pertinent herein, Plaintiff did not know, nor should Plaintiff have

known, of the ongoing contamination of its Property through the use, release, storage, and/or disposal of Defendants' Fluorosurfactant Products as Defendants did not disclose the toxic nature and harmful effects of these Fluorosurfactant Products.

14.     Through this action, Plaintiff seeks to recover compensatory and/or consequential damages for all past and future costs to investigate, remediate, remove, dispose of, treat, and monitor the PFOS and PFOA contamination of Plaintiff's Property caused by the use of Defendants' Fluorosurfactant Products on Plaintiff's Property, as well as any and all other damages recoverable under New Mexico and/or applicable federal laws. Plaintiff also seeks damages and restitution for the diminution of value of Plaintiff's Property, as well as punitive damages and reasonable attorneys' fees and costs.

## PARTIES

15.     Plaintiff Roosevelt County Water Coop, Inc. is public utility in Portales, New Mexico, which provides drinking water services to residents of Roosevelt County who live outside the city of Portales, New Mexico, with its principal address located at 1700 South Avenue D, Portales, New Mexico 88130.

16.     Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products that have and continue to contaminate Plaintiff's Property:

a.      Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation authorized to conduct business in New Mexico, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. Upon information and belief, 3M is the only company that manufactured and/or sold AFFF containing PFOS in the United States, including New Mexico.

b.      Defendant E. I. DuPont De Nemours and Company ("DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. DuPont is registered to do

business in the State of New Mexico.

c.  Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours is registered to do business in the State of New Mexico.

d.  In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of fluorosurfactants and the products that contain fluorosurfactants.

e.  Defendant The Chemours Company FC, LLC ("Chemours FC"), successor in interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company with its principal place of business located at 1007 Market Street Wilmington, Delaware, 19899. Chemours FC is registered to do business in the State of New Mexico.

f.  Defendant DuPont de Nemours, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805. Upon information and belief, DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont. DowDuPont, Inc. was subsequently divided into three publicly traded companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc. ("New DuPont").

g.  Defendant Corteva, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Upon information and belief, Corteva, Inc. is one of the aforementioned

spin-off companies from DowDuPont, Inc., and is believed to have assumed some of the PFAS liabilities of the former DuPont. Corteva, Inc. is registered to do business in New Mexico.

h.      Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Upon information and belief, Chemguard does and/or has done business throughout the United States, including in the State of New Mexico.

i.      Upon information and belief, Chemguard acquired Williams Fire and Hazard Control, Inc. ("WFHC"). Upon information and belief, WFHC has and continues to sell and/or distribute AFFF throughout the United States, including in the State of New Mexico.

j.      Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446. Tyco acquired Chemguard in 2011.

k.      Tyco is the successor-in-interest to The Ansul Company ("Ansul") and manufactures the Ansul brand of products (Ansul and/or Tyco as the successor-in interest to Ansul will be referred to collectively as "Tyco/Ansul"). Upon information and belief Tyco/Ansul does and/or has done business throughout the United States, including in the State of New Mexico.

l.      Defendant Kidde-Fenwal, Inc. ("Kidde") is a Delaware corporation with its principal place of business located at One Financial Plaza, Hartford, Connecticut 06101. Upon information and belief, Kidde was part of UTC Fire & Security Americas Corporation, Inc. Upon information and belief, Kidde-Fenwal, Inc. is the successor-in-interest to Kidde Fire Fighting, Inc.

6

(collectively, "Kidde/Kidde Fire"). Upon information and belief, Kidde/Kidde Fire does and/or has done business throughout the United States, including in the State of New Mexico.

m.    Defendant Kidde PLC, Inc. is a Delaware corporation with its principal place of business located at 9 Farm Springs Road, Farmington, Connecticut 06032. Upon information and belief, Kidde PLC, Inc. was part of UTC Fire & Security Americas Corporation, Inc. Upon information and belief, Kidde PLC, Inc. does and/or has done business throughout the United States, including in the State of New Mexico.

n.    Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, United Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. Upon information and belief, Chubb was part of UTC Fire & Security Americas Corporation, Inc.

o.    Defendant UTC Fire & Security Americas Corporation, Inc. ("UTC") is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach Gardens, Florida 33418. Upon information and belief, UTC was a division of United Technologies Corporation. UTC is registered to do business in New Mexico.

p.    Defendant Carrier Global Corporation is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Carrier Global Corporation is registered to do business in New Mexico.

q.    Defendant Raytheon Technologies Corporation (f/k/a United Technologies

Corporation) ("Raytheon Tech f/k/a United Tech") is a Delaware corporation with its principal place of business at 10 Farm Springs Road, Farmington, Connecticut 06032. Raytheon Tech f/k/a United Tech is registered to do business in New Mexico.

r.   Defendant National Foam, Inc. is a Delaware corporation with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. National Foam, Inc. is a subsidiary of Angus International Safety Group, Ltd. Upon information and belief, National Foam, Inc. manufactures the Angus brand of AFFF products. National Foam, Inc. does and/or has done business throughout the United States, including in the State of New Mexico.

s.   Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086. Buckeye is registered to do business in New Mexico.

t.   Defendant Arkema, Inc. is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema, Inc. is registered to do business in New Mexico.

u.   Defendant BASF Corporation is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon information and belief, BASF Corporation acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals. BASF Corporation is registered to do business in New Mexico. Upon information and belief, Ciba-Geigy Corporation and/or Ciba Specialty Chemicals does and/or has done business throughout the United States, including New Mexico.

v.   Defendant ChemDesign Products, Inc. ("CDPI") is a Delaware corporation with its principal place of business located at 2 Stanton Street, Marinette,

Wisconsin 54143. Upon information and belief, CDPI conducts and/or avails itself of doing business throughout the United States, including New Mexico.

w.     Defendant Clariant Corporation is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205. Clariant Corporation is registered to do business in New Mexico.

x.     Defendant Chemicals Incorporated is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521. Chemicals Incorporated is registered to do business in New Mexico.

y.     Defendant Nation Ford Chemical Company is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715. Upon information and belief, Nation Ford Chemical Company conducts and/or avails itself of doing business throughout the United States, including New Mexico.

z.     Defendant AGC Chemicals Americas, Inc. ("AGC America") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. Upon information and belief, AGC America is subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd. AGC America is registered to do business in New Mexico.

aa.    Defendant AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC"), is a corporation organized under the laws of Japan and does business throughout the United States. AGC has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

bb.    Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business located at 196122 E County

Road 40, Woodward, Oklahoma 73801. Upon information and belief, Deepwater conducts and/or avails itself of doing business throughout the United States, including New Mexico.

cc.   Defendant Dynax Corporation is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523. In 1991, Dynax Corporation entered the market, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in AFFF. Upon information and belief, Dynax Corporation conducts and/or avails itself of doing business throughout the United States, including New Mexico.

dd.   Defendant Archroma Management, LLC, is a foreign limited liability company registered in Switzerland, with a principal business address of Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

ee.   Defendant Archroma U.S., Inc. is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied Fluorosurfactant Products for use in AFFF. Upon information and belief, Archroma U.S., Inc. conducts and/or avails itself of doing business throughout the United States, including New Mexico.

ff.   Upon information and belief, Defendants John Doe 1-49 were designers, manufacturers, marketers, distributors, and/or sellers of Fluorosurfactant Products that have and continue to contaminate Plaintiff's Property. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiff will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

17.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

18.     When the term "Defendants" is used alone, it refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants and did so while acting within the scope of their employment or agency.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiff and Defendants, and the amount in damages exceeds the minimal jurisdictional limits of this Court.

20.     Venue is proper in the United States District Court for the District of New Mexico pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Plaintiff is a resident and citizen, a substantial part of the property that is the subject of this action is situated in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS

### A.  THE CONTAMINANTS: PFOA & PFOS

22.     PFOA and PFOS are man-made chemicals within a class known as perfluoroalkyl acid ("PFAA"). PFAAs are part of the larger chemical family known as PFAS. PFAA is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature, which is a reason why these molecules are so persistent. PFOA and PFOS contain eight carbon-fluorine bonds. For this reason, they are sometimes referred to as "C8."

23.     PFOA and PFOS are highly water soluble, which increases the rate at which they spread throughout the environment, contaminating soil, groundwater, and surface water. Their mobility is made more dangerous by their persistence in the environment and resistance to biologic, environmental, or photochemical degradation.[1]

24.     PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver. They have been found globally in water, soil, air, as well as in human food supplies, breast milk, umbilical cord blood, and human serum.[2]

25.     PFOA and PFOS are persistent in the human body. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[3]

26.     Since they were first produced, information has emerged showing negative health effects caused by exposure to PFOA and PFOS.

27.     According to the United States Environmental Protection Agency ("EPA"), "…studies indicate that exposure of PFOA and PFOS over certain levels may result in…developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."[4]

28.     EPA has also warned that "there is suggestive evidence of carcinogenic potential

---

[1] See U.S. Envtl. Prot. Agency, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA), EPA Document Number: 822-R-16-005 (May 2016) at 16; and Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS), EPA Document Number: 822-R-16-004 (May 2016) at 16, both available at https://19january2017snapshot.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos_.html.
[2] See U.S. Envtl. Prot. Agency, Document Number: 822-R-16-005 (May 2016) at 18-20, 22-27; and EPA Document Number: 822-R-16-004 (May 2016) at 19-21, 26-28.
[3] See U.S. Envtl. Prot. Agency, Document Number: 822-R-16-005 (May 2016) at 55; and EPA Document Number: 822-R-16-004 (May 2016) at 55.
[4] "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003 (Nov. 2016) at 2, available at https://19january2017snapshot.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos_.html.

for PFOS."[5]

29.    EPA has noted that "drinking water can be an additional source [of PFOA/PFOS in the body] in the small percentage of communities where these chemicals have contaminated water supplies." In communities with contaminated water supplies, "such contamination is typically localized and associated with a specific facility, for example…an airfield at which [PFOA/PFOS] were used for firefighting."[6]

30.    EPA has issued Health Advisory Levels of 70 parts per trillion ("ppt") for PFOA and PFOS found in drinking water. When both PFOA and PFOS are found in drinking water, the combined concentrations should not exceed 70 ppt.

31.    In June 2022, the EPA updated the lifetime health advisory levels associated with PFAS to 0.02 ppt for PFOS and 0.004 ppt for PFOA.[7]

32.    On March 14, 2023, the EPA announced the proposed National Primary Drinking Water Regulation to establish legally enforceable levels of PFAS. The proposed regulations sets a maximum contaminant level for PFOS and PFOA at 4 ppt.[8]

**B.  AQUEOUS FILM-FORMING FOAM**

32.    AFFF is a type of water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports and military bases, among other places.

33.    The AFFF designed, manufactured, marketed, distributed, and/or sold by Defendants contained either or both PFOA and PFOS, or the chemical precursors to PFOA or PFOS.

---

[5] "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)" U.S. Environmental Protection Agency Office of Water Health and Ecological Criteria Division, EPA Document Number: 822-R-16-002 (May 2016) at ES-2, available at https://19january2017snapshot.epa.gov/ground-water-and-drinking-water/supporting-documents-drinking-water-health-advisories-pfoa-and-pfos_.html.

[6] *See* "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003 at 1.

[7] "Techinical Fact Sheet: Drinking Water Health Advisories for Four PFAS (PFOA, PFOS, GenX chemicals, and PFBS)," EPA Document Number: 822-F-22-002 (Jun. 2022) at 4, available at https://www.epa.gov/system/files/documents/2022-06/technical-factsheet-four-PFAS.pdf.

[8] *See* https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas.

34.     PFOS and/or the chemical precursors to PFOS contained in 3M's AFFF were manufactured by 3M's patented process of electrochemical fluorination ("ECF").

35.     All other Defendants manufactured fluorosurfactants for use in AFFF through the process of telomerization. Telomerization produced fluorotelomers, including PFOA and/or the chemical precursors to PFOA.

36.     AFFF can be made without PFOA, PFOS, or their precursor chemicals. Fluorine-free foams and short-chains foams do not release PFOA, PFOS, and/or their precursor chemicals into the environment.

37.     AFFF is used to extinguish fires that are difficult to fight, particularly fires that involve petroleum or other flammable liquids. AFFF is typically sprayed directly onto a fire, where it works by coating the ignited fuel source, preventing its contact with oxygen and suppressing combustion.

38.     When used as the Defendants intended and directed, Defendants' AFFF releases PFOA, PFOS, and/or their precursor chemicals into the environment.

39.     Once PFOA and PFOS are free in the environment, these chemicals do not hydrolyze, photolyze, or biodegrade under typical environmental conditions and are extremely persistent in the environment. As a result of their persistence, they are widely distributed throughout soil, air, and groundwater.

40.     The use of Defendants' Fluorosurfactant Products as directed and intended by the Defendants allowed PFOA, PFOS, and/or their precursor chemicals to enter into and onto Plaintiff's Property where these compounds migrated through the subsurface and into the groundwater, thereby contaminating the surface water, soil, sediment, and groundwater, as well as causing other extensive and ongoing damage to Plaintiff's Property.

41.     Due to the chemicals' persistent nature, among other things, these chemicals have, and continue to cause injury and damage to Plaintiff's Property.

**C. DEFENDANTS' KNOWLEDGE OF PFOA AND PFOS HAZARDS**

42.     On information and belief, by the early 1980s, Defendants knew, or reasonably

should have known, among other things, that: (a) PFOA and PFOS are toxic; and (b) when sprayed in the open environment per the instructions given by the manufacturer, PFOA and PFOS readily migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

43.     Defendants also knew or reasonable should have known that PFOA and PFOS could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.

44.     In 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.[9]

45.     By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

46.     In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[10]

47.     Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are

---

[9] See Letter from 3M to Office of Pollution Prevention and Toxics, EPA titled "TSCA 8e Supplemental Submission, Docket Nos. 8EHQ-0373/0374 New Data on Half Life of Perfluorochemicals in Serum," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

[10] See Memorandum "C-8 Blood Sampling Results, Births and Pregnancies," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."

48.     In March of 1999, a 3M Environmental Specialist resigned because of his "profound disappointment in 3M's handling of the environmental risks associated with the manufacture and use of [PFOS] and its precursors, [. . .]."[11]

49.     In the 3M Environmental Specialist's resignation letter dated March 28, 1999, he stated that "[PFOS] is the most insidious pollutant since PCB."[12] Further, he noted that during his tenure, and for 20 years prior, 3M refused to perform an "ecological risk assessment" on PFOS and that "3M told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on issues because of how our speculations could be viewed in a legal discovery process."[13]

50.     Based on information and belief, in 2000, under pressure from the EPA, 3M announced that it was phasing out PFOS and U.S. production of PFOS; 3M's PFOS-based AFFF production did not fully phase out until 2002.

51.     From 1951, DuPont, and on information and belief, Chemours, designed, manufactured, marketed, and sold Fluorosurfactant Products, including Teflon nonstick cookware, and more recently PFAS feedstocks, such as Forafac 1157 N, for the use in the manufacture of AFFF products.

52.     Based on information and belief, in 2001 or earlier, DuPont manufactured, produced, marketed, and sold Fluorosurfactant Products and/or PFAS feedstocks to some or all the AFFF product manufacturers for use in their AFFF products that were discharged into the environment and contaminated Plaintiff's Property.

53.     DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the public or to government regulators what they knew about the substance's potential effects

---

[11] *See* Resignation Letter of Rich Purdy, Environmental Specialist 3M, Mar. 28, 1999, available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1001.pdf.
[12] *Id*.
[13] *Id*.

on humans, animals, or the environment.[14]

54.    By December 2005, the EPA uncovered evidence that DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History."[15] The EPA fined DuPont for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the EPA substantial risk information about chemicals they manufacture, process or distribute in commerce."[16]

55.    By July 2011, DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified DuPont of a "probable link"[17] between PFOA exposure and the serious (and potentially fatal) conditions of pregnancy-induced hypertension and preeclampsia.[18] By October 2012, the C8 Science Panel had notified DuPont of a probable link between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

56.    In July 2015, DuPont spun off its chemicals division by creating Chemours as a new publicly traded company, once wholly owned by DuPont. By mid-2015, DuPont had dumped

---

[14] *See, e.g.,* Fred Biddle, "DuPont confronted over chemical's safety," *Wilmington News Journal* (Apr. 13, 2003), available at https://www.fluoridealert.org/wp-content/pesticides/effect.pfos. class.news.31.htm (last viewed on Apr. 10, 2023). The *Wilmington News Journal* is published in Wilmington, Ohio.

[15] $16.5 million.

[16] U.S. Envtl. Prot. Agency, Reference News Release, "EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History" (Dec. 14, 2005), https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/fdcb2f665cac66bb8525 70d7005d6665.html (last viewed on Apr. 10, 2023).

[17] Under the settlement, "probable link," means that given the available scientific evidence, it is more likely than not that among class members a connection exists between PFOA/C8 exposure and a particular human disease.

[18] *See* The C8 Science Panel, Status Report: PFOA (C8) exposure and pregnancy outcome among participants in the C8 Health Project (Jul. 15, 2011), http://www.c8sciencepanel.org/pdfs/ Status_Report_C8_and_pregnancy_outcome_15July2011.pdf (last viewed on Apr. 10. 2023).

its perfluorinated chemical liabilities into the lap of the new Chemours.

57.     Notwithstanding this knowledge, Defendants negligently and carelessly: (1) designed, manufactured, marketed, distributed, and/or sold Fluorosurfactant Products; (2) issued instructions on how Fluorosurfactant Products should be used and disposed of (namely, by washing the foam into the soil or wastewater system), thus improperly permitting PFOA and/or PFOS to contaminate the surface water, soil, and groundwater in and around the Plaintiff's Property; (3) failed to recall and/or warn the users of Fluorosurfactant Products, negligently designed products containing or degrading into PFOA and/or PFOS, of the dangers of surface water, soil, and groundwater contamination as a result of standard use and disposal of these products; and (4) further failed and refused to issue the appropriate warnings and/or recalls to the users of Fluorosurfactant Products, notwithstanding the fact that Defendants knew the identity of the purchasers of the Fluorosurfactant Products.

58.     As a direct result of Defendants' actions and/or inactions alleged in this Complaint, Plaintiff's Property has been and will continue to be contaminated with PFAS, including PFOA and PFOS, creating an environmental hazard, unless such contamination is remediated. As a direct and proximate result of Defendants' actions and/or inactions, Plaintiff must assess, evaluate, investigate, monitor, remove, clean up, correct, treat, and remediate PFOA and PFOS contamination on its Property at significant expense, loss and damage.

59.     Defendants had a duty and breached their duty to evaluate and test such Fluorosurfactant Products adequately and thoroughly to determine their potential human health and environmental impacts before they sold such products. They also had a duty and breached their duty to minimize the environmental harm caused by Fluorosurfactant Products.

### D. THE IMPACT OF PFOA AND PFOS ON PLAINTIFF'S PROPERTY

60.     PFOA and PFOS have been detected in varying amounts, at varying times in soil and water extracted from Plaintiff's Property. PFOA and PFOS have been detected and/or are present in certain areas of Plaintiff's Property. PFOA and PFOS have been detected at Plaintiff's Property at levels that are substantially greater than the current State and Federal Advisory Levels.

The detection and/or presence of PFOA and PFOS, and the threat of further detection and/or presence of PFOA and PFOS, in Plaintiff's Property in varying amounts and at varying times has resulted, and will continue to result, in significant injuries and damage to Plaintiff.

61.     Upon information and belief, the invasion of Plaintiff's Property with PFOA and PFOS is recurring, resulting in new harm to Plaintiff on each occasion.

62.     The injuries to Plaintiff caused by Defendants' conduct constitute an unreasonable interference with, and damage to, Plaintiff and Plaintiff's Property. Plaintiff's interests in protecting its Property constitute a reason for seeking damages sufficient to restore such Property to its pre-contamination condition, in addition to the other damages sought herein.

## FIRST CAUSE OF ACTION

### STRICT LIABILITY

63.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

64.     Defendants, as designers, manufacturers, formulators, distributors, promotors, marketers, suppliers, and sellers of Fluorosurfactant Products are liable for the harms caused by an unreasonable risk of injury resulting from the condition of their Fluorosurfactant Products and/or from the manner of their intended use.

65.     An unreasonable risk of injury is a risk which a reasonably prudent person having full knowledge of the risk would find unacceptable, taking into consideration the ability to eliminate the risk without seriously impairing the usefulness of the product or making it unduly expensive. Such an unreasonable risk of harm makes the product defective, irrespective of the care taken in the manufacture and supply process.

66.     Defendants' Fluorosurfactant Products were expected to, and did, reach Plaintiff, the public, water providers, public officials and other end users, without substantial change in the condition in which they were sold.

67.     Defendants' Fluorosurfactant Products were, and are defective, and therefore present an unreasonable risk of injury.

68.     Defendants' Fluorosurfactant Products were, and are defective as a result of at least

the following conditions:

    a.    The Fluorosurfactant Products were designed with dangerous and toxic chemicals, including but not limited to PFOA and PFAS, that contaminate the environment and present significant human health hazards.

    b.    The Fluorosurfactant Products were designed without proper warnings and/or instructions regarding the potential and/or actual contamination that the Fluorosurfactant Products cause to the environment and human health.

    c.    Defendants failed to adequately and properly warn reasonably anticipated users, including Plaintiff, of the defective conditions of their Fluorosurfactant Products.

    d.    Defendants represented, asserted, claimed and/or warranted that their Fluorosurfactant Products could be used in conformity with accompanying instructions and labels in a manner that would not cause injury or damage.

    e.    Defendants failed to take any action to mitigate hazards associated with the use of their defective Fluorosurfactant Products and/or prevent the distribution and sale.

69.    These defects existed at the time the Fluorosurfactant Products left Defendants' control.

70.    Defendants knew that their Fluorosurfactant Products would be purchased, transported, stored, handled, and used without notice of these defects.

71.    At the time of design and manufacture, there were safer alternative designs that were feasible, cost effective, and advantageous, including but not limited to, not using PFOS, PFOA and/or their precursor chemicals in products.

72.    The Fluorosurfactant Products were used by Plaintiff, the public, water providers, public officials or other end users, for their intended and/or reasonably foreseeable purpose.

73.    Defendants could not reasonably expect that the harms set forth herein were obvious or known to foreseeable users of their Fluorosurfactant Products.

74.     The condition of Defendants' defective Fluorosurfactant Products caused Plaintiff to suffer injury.

75.     As a direct, legal, and proximate result of Defendants' defective design of its Fluorosurfactant Products that Plaintiff used, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

## SECOND CAUSE OF ACTION

### PUBLIC NUISANCE

76.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

77.     Defendants have contributed to, and/or assisted in creating and maintaining a condition that is harmful to the health, safety, welfare, and comfort of the general public, including, but not limited to Plaintiff, which unreasonably and substantially interferes with the enjoyment of life in violation of New Mexico law.

78.     Defendants' actions and/or inactions have caused contamination of Plaintiff's Property, including Plaintiff's water supply source, with PFAS and/or PFOA. The exposure to known toxic chemicals manufactured and/or sold by Defendants has affected and continues to affect a substantial number of New Mexico residents who rely upon Plaintiff for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe natural resources and environment.

79.     Contamination of Plaintiff's Property, including Plaintiff's water supply source, with PFAS and/or PFOA; and the exposure to known toxic chemicals manufactured and/or sold by Defendants are a public nuisance in New Mexico, which remains unabated. The unlawful conduct by the Defendants has created hazards to public health and safety.

80.     The health and safety of the general public of New Mexico, including those who have been or will be affected by Defendants' contamination of Plaintiff's Property, is a matter of

great public interest and of legitimate concern to New Mexico citizens and residents.

81.     The public nuisance created by Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit.

82.     Defendants knew, or should have known, that their introduction of Fluorosurfactant Products into the environment would create a public nuisance.

83.     Plaintiff has suffered, and will continue to suffer, harm that is different from the type of harm suffered by the general public, because its damages include *inter alia*,  substantial costs to remove the contamination from its Property, as described in this Complaint.

84.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

### THIRD CAUSE OF ACTION

#### PRIVATE NUISANCE

85.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

86.     Plaintiff's Property has been, and continues to be, contaminated by PFAS as a direct and proximate result of the acts and omissions of Defendants as set forth above.

87.     Actual and threatened PFAS contamination caused by Defendants' conduct has caused, and continues to cause, injury to Plaintiff in the form of present and serious interference with the ordinary safety, use, benefit, and/or enjoyment of Plaintiff's Property.

88.     Defendants' actions have been intentional and unreasonable as set forth above.

89.     As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation,

monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

**FOURTH CAUSE OF ACTION**

**TRESPASS**

90.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

91.     Plaintiff is the owner and/or actual possessor of Plaintiff's Property and other relevant structures located thereon. Defendants knew, or in the exercise of reasonable care should have known, that PFOA and/or PFOS contaminates soil, surface, and groundwater, including the property and other rights of Plaintiff.

92.     Defendants' failed to properly warn against the use of Fluorosurfactant Products at, near, and/or in the vicinity of Plaintiff's Property which allowed PFOS, PFOA, and/or their chemical precursors to enter the environment, and migrate through the soil, sediment, surface water, and groundwater, thereby contaminating Plaintiff's Property.

93.     Defendants' entry onto Plaintiff's Property was without Plaintiff's consent, and Defendants' entry onto Plaintiff's Property for that unauthorized purpose constitutes common-law trespass.

94.     Defendant's entry has contaminated Plaintiff's Property, has varied over time, and has not yet ceased. PFOA and/or PFOS continue to migrate onto and enter Plaintiff's Property. The contamination is reasonably abatable.

95.     Defendants knew, or in the exercise of reasonable care should have known, that PFOA and/or PFOS contaminates soil, surface, and groundwater, including the property and other rights of Plaintiff.

96.     Plaintiff was, is, and will continue to be harmed by the entry of Defendants' Fluorosurfactant Products onto its Property.

97.     As a direct and proximate result of Defendants' above described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS

contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

**FIFTH CAUSE OF ACTION**

**NEGLIGENCE – FAILURE TO WARN**

98.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

99.     Defendants, as manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, and/or handlers of Fluorosurfactant Products, owed a duty to Plaintiff, as well as to all persons whom Defendants' Fluorosurfactant Products might foreseeably harm, to exercise ordinary care in the instructing, labeling, and warning of the dangers associated with the handling, control, use, and disposal of Defendants' Fluorosurfactant Products.

100.    Despite the fact that Defendants knew that PFOA and PFOS are toxic, can contaminate soil and water resources, and present significant risks to human health and the environment, Defendants (a) failed to issue adequate instructions on how Fluorosurfactant Products should be used and disposed of, thus improperly permitting PFOA and/or PFOS to enter and contaminate Plaintiff's Property; (b) failed to warn the Plaintiff of the dangers of soil and water contamination as a result of standard use and disposal of these products; and (c) failed/ refused to issue the appropriate warnings to the users of Fluorosurfactant Products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their Fluorosurfactant Products.

101.    A reasonably prudent manufacturer, seller, and/or distributor, under the same or similar circumstances would have warned of the danger and/or instructed on the safe use of Fluorosurfactant Products.

102.    Plaintiff was, is, and will continue to be harmed by Defendants failure to exercise ordinary care in the instructing, labeling, and warning of the dangers associated with the handling,

control, use, and disposal of Defendants' Fluorosurfactant Products.

103.    Defendants' failure to adequately warn and/or instruct was a substantial factor in causing Plaintiff's harm.

104.    Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

105.    As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

**SIXTH CAUSE OF ACTION**

**NEGLIGENCE – FAILURE TO RECALL**

106.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

107.    Defendants' Fluorosurfactant Products were designed, manufactured, marketed, distributed and sold by Defendants without adequate warning of toxicity, potential human health risks and environmental hazards.

108.    Defendants were negligent by failing to exercise ordinary care to warn or instruct about the risks associated with their Fluorosurfactant Products.

109.    Defendants knew or reasonably should have known that their Fluorosurfactant Products were dangerous or likely to be dangerous when used or misused in a reasonably foreseeable manner.

110.    Defendants knew or reasonably should have known that Plaintiff,  users and third parties would not realize the dangers.

111.    Defendants became aware of the human health risks and environmental hazards presented by their Fluorosurfactant Products by no later than the year 2000.

112.    Defendants failed to recall their Fluorosurfactant Products despite being aware of the human health risks and environmental hazards presented by their Fluorosurfactant Products

113.    A reasonably prudent manufacturer, seller, or distributor, under the same or similar circumstances would have issued a recall of its Fluorosurfactant Products.

114.    Plaintiff was, is, and will continue to be harmed by Defendants' failure to recall their Fluorosurfactant Products.

115.    Defendants' failure to recall their Fluorosurfactant Products was a substantial factor in causing Plaintiff's harm.

116.    Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

117.    As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its Property, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, punitive damages, diminution of property value, and all other equitable and applicable damages.

**SEVENTH CAUSE OF ACTION**

**VIOLATION OF NEW MEXICO UNFAIR PRACTICES ACT**

**(NMSA 1978 §§ 57-12-1 to -26)**

118.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

119.    At all times herein, the Defendants violated the New Mexico Unfair Practices Act, §§ 57-12-1 to -26, by committing repeated knowing and/or willful unfair or deceptive acts or practices, and unconscionable trade practice, in the conduct of commerce, both of which are violations of the Act.

120.    As alleged herein, each Defendant violated the Unfair Practices Act by failing to report, prevent the sale of, and/or prevent any act or practice in connection with the offering for

sale of the highly toxic and harmful effects of Fluorosurfactant Products. This was an unconscionable trade practice that took advantage of Plaintiff and New Mexico residents to their detriment and to a grossly unfair degree. NMSA 1978, § 57-12-2(E)(1).

121.    Despite the fact that Defendants knew that PFOA and PFOS are toxic, can contaminate soil and water resources, and present significant risks to human health and the environment, Defendants knowingly and willfully: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold Fluorosurfactant Products; (b) issued instructions on how Fluorosurfactant Products should be used and disposed of, thus improperly permitting PFOA and/or PFOS to enter and contaminate Plaintiff's Property; (c) failed to warn the users of Fluorosurfactant Products of the dangers of soil and water contamination as a result of standard use and disposal of these products; and (d) failed and refused to issue the appropriate warnings to the users of Fluorosurfactant Products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their Fluorosurfactant Products. Each Defendant had a non-delegable duty to guard against and prevent the designing, manufacturing, formulating, handling, labeling, instructing, controlling, marketing, promoting of PFOA and PFOS chemicals in the state of New Mexico. Accordingly, Defendants' acts and/or omissions constituted unconscionable trade practices under NMSA 1978 § 57-12-2(E)(2) in that Defendants' practices resulted in a gross disparity between value received and price paid.

122.    The Defendants violated the Unfair Practice Act by committing unfair or deceptive trade practices as defined in the Unfair Practice Act by representing that Fluorosurfactant Products "have… characteristics… that they do not have." NMSA 1978, § 57-12(D)(5).

123.    The Defendants also committed unfair or deceptive trade practices by representing that Fluorosurfactant Products were safe and effective when such representations were untrue, false, and misleading in violation of Section 57-12-2(D)(7).

124.    The Defendants also used exaggeration and/or ambiguity as to material facts and omitted material facts, which had a tendency to deceive and/or did in fact deceive the United States

of America (specifically, the United States Air Force) and/or other users of the Fluorosurfactant Products, to the detriment of Plaintiff. NMSA 1978, § 57-12-2(D)(14).

125. Defendants thereby omitted to disclose material facts regarding the safety of PFOA, PFOS, and/or Fluorosurfactant Products while they designed, manufactured, formulated, marketed, distributed, and/or sold their products, causing such representations to be false and/or misleading.

126. Defendants were actually aware of the misleading nature of their representations, and/or should have been aware that their representations regarding the safety of PFOA, PFOS, and/or Fluorosurfactant Products were false and/or misleading.

127. Furthermore, Defendants also willfully violated the Unfair Practices Act, as Defendants intentionally acted with the knowledge that harm to Plaintiff would result through their acts and/or omissions.

128. Defendants' unfair, deceptive, and unconscionable representations, concealments, and omissions were reasonably calculated to deceive the United States of America (specifically, the United States Air Force), were made with the intent to deceive the United States of America, and did in fact deceive United States of America who paid for PFOA, PFOS, and/or Fluorosurfactant Products.

129. Defendants' representations, concealments, and omissions were made in connection to the sale, lease, rental, or loans of goods and services in the regular course of Defendants' business.

130. As described more specifically above, Defendants' representations, concealments, and omissions constitute a willful course of conduct which continues to this day. Unless enjoined from doing so, the Defendants will continue to violate the New Mexico Unfair Practices Act. Plaintiff is thereby entitled to an injunction with terms that the court considers reasonable, pursuant to NMSA 1978 § 57-12-10(A).

131. But for these deceptive representations and concealments of material fact and material omissions, Plaintiff would not incur harm, including without limitation the costs of the

investigating, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs as a result of harmful and toxic PFOA, PFOS, and/or Fluorosurfactant Products.

132.    Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, abatement, reimbursement of all monies paid to remediate the impacts of PFOA, PFOS, and/or Fluorosurfactant Products by Plaintiff, damages as allowed by law, all recoverable penalties under NMSA 1978 § 57-12-10 including, but not limited to an injunction, actual damages, the investigation, monitoring, treatment, testing, remediation, removal, filtration, and/or disposal of the PFAS contamination, operating, maintenance and consulting costs, legal fees, punitive damages, diminution of property value, treble damages, fees and costs, and pre- and post-judgment interest.

## EIGHTH CAUSE OF ACTION

## VIOLATION OF THE UNIFORM VOIDABLE TRANSFER ACT

### (NMSA §§ 56-10-14 to -24)

133.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

134.    Plaintiff seeks equitable and other relief pursuant to the Uniform Voidable Transfer Act ("UVTA") as adopted by the State of New Mexico in N.M. Stat. Ann. §§ 56-10-14 to -24 against E. I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont De Nemours, Inc. (collectively, the "UVTA Defendants").

135.    Pursuant to N.M. Stat. Ann. § 56-10-18, "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (1)    with actual intent to hinder, delay or defraud any creditor of the debtor; or
>
> (2)    without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>> (a)    was engaged or was about to engage in a business or a transaction

for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(b)     intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

136.    Further, N.M. Stat. Ann. § 56-10-18 states that, "[i]n determining actual intent under Paragraph (1) of Subsection A of this section, consideration may be given, among other factors, to whether: [...] before the transfer was made or obligation was incurred, the debtor has been sued or threatened with suit; [...] the transfer was of substantially all the debtor's assets; [...] the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred…"

137.    Upon information and belief, in February 2014, E. I. DuPont de Nemours and Company formed The Chemours Company as a wholly owned subsidiary and used it to spin off DuPont's "Performance Chemicals" business line in July 2015

138.    Upon information and belief, at the time of the spinoff, DuPont's Performance Chemicals division contained the Fluorosurfactant Products business segments. In addition to the transfer of the Performance Chemicals division, The Chemours Company accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFAS

139.    Upon information and belief, at the time of the transfer of its Performance Chemicals business to The Chemours Company, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture and sale of Fluorosurfactant Products.

140.    The UVTA Defendants acted (a) with actual intent to hinder, delay and to defraud any creditor of the UVTA Defendants or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (1) were engaged and or about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business; or; (2) intended to incur, or believed or reasonably should have believed or reasonably

should have believed that the Chemours Company would incur, debts beyond its ability to pay as they became due.

141.    The UVTA Defendants engaged in actions in furtherance of a scheme to transfer E. I. DuPont de Nemours and Company's assets out of the reach of Plaintiff, and other similar parties, that have been damaged as a result of UVTA Defendants' conduct, omissions, and actions described herein.

142.    As a result of the transfer of assets and liabilities described in this Complaint, the UVTA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of Fluorosurfactant Products.

143.    Pursuant to N.M. Stat. Ann. § 56-10-21, Plaintiff seeks avoidance of the transfer of E. I. DuPont de Nemours and Company's liabilities for the claims brought in this Complaint and to hold the UVTA Defendants liable for any damages or other remedies that may be awarded by the Court or jury to the Plaintiff in this action.

144.    Plaintiff further seeks all other rights and remedies that may be available to it under UVTA, including prejudgment remedies as available under applicable law, as may be necessary to fully compensate Plaintiff for the damages and injuries it has suffered as alleged in this Complaint.

## <u>NINTH CAUSE OF ACTION</u>
### CIVIL CONSPIRACY

145.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

146.    At all times relevant herein, Defendants knew of the hazards that PFOS and/or PFOA posed to the environment, including Plaintiff's Property.

147.    Beginning in the 1960s and continuing through the date of the filing of this Complaint, Defendants agreed to engage and conspired to participate in unlawful and wrongful acts that caused damage to the Plaintiff. Each Defendant performed at least one overt act in furtherance of this conspiracy. Specifically, Defendants colluded for the avowed purpose of

providing information about Fluorosurfactant Products to the public and the government, with the true, unlawful purposes of:

    a.    intentionally misrepresenting to the EPA and the public that their Fluorosurfactant Products were safe and did not pose a risk to human health and the environment;

    b.    concealing the dangers of their Fluorosurfactant Products, including the products' characteristics and their propensity to contaminate soil and groundwater, from the government and public by, among other means, repeatedly misrepresenting how Fluorosurfactant Products were being disposed of;

    c.    concealing the dangers of PFOA and/or PFOS from consumers and the public; and

    d.    using their considerable resources to fight legislation concerning PFOA and/or PFOS.

148.    As a direct and proximate result of Defendants' conspiracy, Defendants' Fluorosurfactant Products at all times relevant to this litigation have:

    a.    posed and continue to pose a threat to Plaintiff's Property;

    b.    contaminated and will continue to contaminate Plaintiff's Property;

    c.    contaminated and will continue to contaminate the soil, surface water, and groundwater on and within the vicinity of Plaintiff's Property;

    d.    required and will continue to require testing and monitoring of Plaintiff's Property for PFAS contamination;

    e.    required or will require remediation of PFAS contamination, or where remediation is impracticable or insufficient for Plaintiff, removal, and disposal of the contamination;

    f.    diminished Plaintiff's confidence in, and the use and enjoyment of, Plaintiff's Property;

g.      diminished Plaintiff's Property value due to actual, impending, and/or threatened PFAS contamination; and

h.      caused and/or will cause Plaintiff to sustain substantially increased damages and expenses resulting from the loss of the safety, use, benefit, and/or enjoyment of its Property.

## PUNITIVE DAMAGES

149.    Under the applicable laws of the State of New Mexico, Plaintiff seeks punitive damages due to the wanton and willful acts and/or omissions of Defendants as set forth and alleged throughout this Complaint.

## PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1.      Compensatory damages according to proof including, but not limited to:

a.      costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of PFAS contamination on and within Plaintiff's Property;

b.      costs and expenses related to the past, present, and future treatment and remediation of PFAS contamination of Plaintiff's Property;

c.      costs and expenses associated with and related to the removal and disposal of the PFAS contamination from Plaintiff's Property; and

d.      costs and expenses related to the past, present, and future installation and maintenance of monitoring mechanisms to assess and evaluate PFAS on and within Plaintiff's Property.

2.      Diminished property value;

3.      Consequential damages;

4.      Punitive damages;

5.      Costs, disbursements, and attorneys' fees of this lawsuit;

6.      Pre-judgment and post-judgment interest; and

7.      Any other and further relief as the Court deems just, proper, and equitable.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial.

Dated: May 2, 2023


By:     */s/ Jacob Payne, Esq.*
        Jacob Payne, Esq. (NM Bar 142971)
        **SINGLETON SCHREIBER, LLP**
        634 Hwy 314 NW
        Los Lunas, NM  87031
        Tel: (505) 587-3473

        *Attorneys for Plaintiffs*